Jeffrey H. Ochrach [SBN 131027]
OCHRACH LAW GROUP
Rocklin Professional Building
5701 Lonetree Blvd., Ste. 213
Rocklin, California 95765
Telephone:     916-626-6880
Facsimile:      916-626-3331
Email: jeffochrach@ochrach.com

Attorney for Karra and Christopher Crowley
and Crowley Properties

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | | |
|---|---|---|
| KARRA CROWLEY, CHRISTOPHER CROWLEY and CROWLEY PROPERTIES,<br><br>Plaintiffs,<br><br>vs.<br><br>BLACK LIVES MATTER, SACRAMENTO and TANYA FAISON and DOES 1-50, inclusive,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 2:21-CV-00778-MCE-JDP<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STRIKE<br><br>Date:        June 24, 2021<br>Time:       2:00 p.m.<br>Location:  Robert T. Matsui U.S. Courthouse<br>              501 I Street<br>              Sacramento, CA 95814<br>Ctrm.:     7 (14th Floor)<br>Judge:     Hon. Morrison C. England, Jr. |

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    THE LEGAL STANDARD FOR CALIFORNIA ANTI-SLAPP MOTIONS IN
         FEDERAL COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    DEFENDANTS' PUBLICATIONS ARE NOT PROTECTED ACTIVITY . . . . . 7

        1.    PLAINTIFFS ARE NOT PUBLIC FIGURES . . . . . . . . . . . . . . . . . . 11

    C.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS . . . . . . . . . . . 13

        1.    THE EVIDENCE PROVES DEFENDANTS' ACTUAL MALICE . . . . 14

            (a)    DEFENDANTS ARGUE THE WRONG STANDARD FOR
                 "ACTUAL MALICE" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    SECTION 230 DOES NOT IMMUNIZE DEFENDANTS . . . . . . . . . 16

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

**CASES**

*Abir Vohen Treyzon Salo, LLP v. Lahiji*, 40 Cal.App.5th 882, 889 . . . . . . . . . . . . . . . . . . . . . . . 13

*Accord, Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 85 . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 13

*Barrett v. Rosenthal*, 40 Cal. 4th 33, 44 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Barry v. State Bar of California*, 2 Cal.5th 318, 321 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 16, 17, 18

*Beauharnais v. Illinois* (1952) 343 U.S. 250, 254–256, 72 S.Ct. 725, 729-731. . . . . . . . . . . . . 13

*Bernstein v. LaBeouf*, 43 Cal.App.5th 15 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Condit v. Nat'l Enquirer, Inc.*, 248 F. Supp. 2d 945, 967 (E.D. Cal. 2002). . . . . . . . . . . . . . . . . 13

*Consumer Justice Center v. Trimedica International, Inc.*, *supra*, 107 Cal.App.4th at p. 601,
132 Cal.Rptr.2d 191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098, 1105-1106 . . . . 9

*Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 . . . . . . . . . . . . . . 9

*FilmOn.com v. DoubleVerify, Inc.* (2019) 7 Cal.5th 133, 141-142 . . . . . . . . . . . . . . . . . . . 7, 8, 12

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696,
105 L. Ed. 2d 562 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979. . . . . . . . . . . 16

*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 . . . . . . . . . . . . . . . . . 13

*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90 . . . . . . . . . . . . . . . . . . . . . . . 9

*Masson v. New Yorker Magazine, Inc.*(1991) 501 U.S. 496,
111 S.Ct. 2419, 115 L.Ed.2d 447 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (citing  Civ. Proc. Code § 425.16(b). . . . . . 6

*Planned Parenthood Fed'n of Am., Inc v Ctr. For Med. Progress,* 890 F.3d 828 . . . . . . . . . . . . . 6

*Rand Resources, LLC v. City of Carson, supra*, 6 Cal.5th at p. 625,
243 Cal.Rptr.3d 1, 433 P.3d 899. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Samaan v. Sauer*, 2008 WL 4279385, at *3 (E.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 13P

*Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132 . . . . . . . . . . . . . . . . . 2, 13

*Taus v. Loftus* (2007) 40 Cal.4th 683, 720, 721-722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Todd v. Lovecruft*, 2020 WL 60199, at *8 (N.D. Cal. Jan. 6, 2020). . . . . . . . . . . . . . . . . . . . . . . 7

*Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) . . . . . . . 7

*Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1133 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 885-898, 903 . . . . . . . . . . . . . . . . 8, 9

*Z.F. v. Ripon Unified School District*, 482 Fed. App'x 239, 240 (9th Cir. 2012) . . . . . . . . . . . . 6

## STATUTES

Code of Civil Procedure section 425.16, subdivisions (e)(3) and (4). . . . . . . . . . . . . . . . . . . . . . . 7

## Other Authorities

*https://fitchburgstate.libguides.com/c.php?g=1046516&p=7602969* . . . . . . . . . . . . . . . . . . . . . 10

*https://health.cornell.edu/initiatives/skorton-center/racism-public-health-crisis* . . . . . . . . . . . . 9

*https://www.brookings.edu/blog/how-we-rise/2020/06/11/systemic-racism-and-america-today* . . 9

*https://www.npr.org/2020/07/01/885878564/what-systemic-racism-means-and-the-way-it-harms-communities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1 **I.     INTRODUCTION**

2        Someone posing as Plaintiff Karra Crowley ("the imposter") sent racists emails to

3 Defendants Black Lives Matter Sacramento ("BLM Sacramento") and Tanya Faison.  Defendants

4 posted those emails on the BLM Sacramento Facebook page and falsely stated that Defendants

5 had "verified" that the emails were from Karra Crowley and added, "WE KNOW HER" home,

6 business and P.O. box addresses in Roseville and Loomis; "SHE HAS BEEN VERIFIED."

7        Defendants then encouraged their Facebook "friends"[1] to take action against Plaintiffs:

8 "So this woman Karra Crowley has been emailing us and **we figured she needs to be famous. . .**

9 **.**" (Bold added.)  Defendants' friends did as they were told, disparaging Plaintiffs in the most vile

10 ways – and even threatening to kill Mr. and Mrs. Crowley, their daughter and their lawyer.  (*See*

11 *e.g.,* Ex. "C.")

12        **However, Karra Crowley did not write or send the subject emails.**

13        As a matter of law, statements that a person made racist comments are libel per se.

14 *Samaan v. Sauer*, 2008 WL 4279385, at \*3 (E.D. Cal. 2008).  Likewise, "[f]alsely ascribing

15 statements to a person which would have the same damaging effect as a defamatory statement

16 about him is libel."  *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132.

17        Defendants argue that their defamatory statements are protected because they are "in

18 connection with a public issue."  The public issue is systemic racism.  However, the evidence

19 proves that neither the imposter's emails nor Defendants' Facebook posts discussed systemic

20 racism, and Defendants' posts did not contribute to a discussion of systemic racism.

21        Rather, the imposter's emails were the racist rants of a single person.  No more; no less.

22 The public is not interested in or debating whether some individuals in the United States are

23 racists; clearly *some* people are racists.  The public interest is in the issue of whether *systemic or*

24 *institutional racism* exists and, if so, how to address it.  Defendants' posts incited Defendants'

25 friends to personally attack Plaintiffs – in their Facebook posts, emails, and phone messages to

26 Plaintiffs.  Not one of these attacks mentioned the public issue of systemic racism.

27

28        [1]     A Facebook "friend" "means you may see each other's activity in News Feed,
Stories and Photos."  https://www.facebook.com/help/friends/requests.

1    Therefore, Defendants' defamatory statements and conduct are not protected under the
2    anti-SLAPP statute.

3    Moreover, even if this Court deemed Defendants' posts to be protected speech, the
4    complaint specifically alleges that Defendants acted maliciously (Compl., ¶ 24), and Plaintiffs'
5    evidence proves actual malice. In particular, the evidence establishes that Defendants falsely
6    stated that they had verified that the imposter's emails were from Ms. Crowley. (Ex. "A.") Also,
7    Defendants maliciously encouraged their friends to make Ms. Crowley "famous"; and, to help in
8    that regard, Defendants posted the cities in which Plaintiffs live and work. (*Id.*) As a result of
9    Defendants' posts, a wave of verbal attacks and threats rained down on Plaintiffs. Defendants
10   generated the responses they sought: Defendants' friends attacked Plaintiffs with hateful and
11   threatening Facebook posts, texts and phone messages. (K. Crowley Decl., ¶¶ 15-17, 19 and 20.)

12   Finally, Defendants argue that Section 230 of the Communications Decency Act provides
13   them with immunity from defamation claims. The evidence proves that Section 230 is
14   inapplicable. Defendants must prove that the imposter "provided" his/her racist emails to
15   Defendants *"for use on the Internet* or another interactive computer service." *Batzel v. Smith,*
16   333 F.3d 1018, 1033 (9th Cir. 2003); italics original. The evidence demonstrates that the
17   imposter emailed his/her racist content to BLM Sacramento and to Tanya Faison; the imposter
18   did not post this content to BLM Sacramento's Facebook page or any other computer service.
19   Furthermore, the evidence does not in any way indicate that the imposter intended for his/her
20   emails to be published on the internet. Instead, the imposter's emails appear to be direct and
21   personal racist attacks on a small California corporation, BLM Sacramento and its founder,
22   Ms. Faison.

23   Also, the "content provider" is always liable for his/her own content. Defendants argue
24   that they posted content from another person (the imposter) and, therefore, are immune from
25   liability under Section 230. But, under Section 230, a pertinent question is whether the imposter
26   "was the sole content provider of his e-mail, or whether [Defendants] can also be considered to
27   have 'creat[ed]'or 'develop[ed]' [the imposter's] e-mail message forwarded to [Facebook]."
28   *Batzel,* 333 F.3d at 1031.

1   Here, Defendants did not merely post the imposter's emails. Defendants posted that they

2   "verified" Ms. Crowley's identity and encouraged Defendants' friends to take action against

3   Plaintiffs. Therefore, Defendants developed and created their own content, using the imposter's

4   emails as a springboard.

5   Because the imposter's emails were not intended to be posted on Facebook, and/or

6   because the imposter was not the sole content provider pertaining to his/her emails, Section 230

7   does not provide Defendants with immunity. *See Id.* at 1033-1034.

8   **II.   STATEMENT OF FACTS**

9   On April 25 and 26, 2021, a currently-unknown person (the "impostor") sent BLM

10   Sacramento the following emails from the email address crowleykarra64@gmail.com, which the

11   imposter appears to have created for the sole purpose of sending these emails:

12   To whom it may concern,

13   I am sick and tired of hearing about you guys on the news. You guys are nothing
     but a bunch of domestic terrorists. Crying because you can't have your way about
14   something. Why don't you just give up, your never going to be able to change the
     world. EVER!!!! GROW THE FUCK UP. White lives matter !!!!

15
     Karra Crowley.
16
     Crowley Properties
17

18   (ECF No. 1 ("Compl.") ¶ 10; Ex. "A"; K. Crowley Decl., ¶¶ 3-7.)

19   My husband and I are pillars in this community. We have always taught our
     children to fear African Americans!!!! You are nothing but thugs and low life's.
20   Seriously why don't you guys just stop with the bullshit, your never going to
     change the world, so give up. White people are kings!!!! You are peasants!!!!
21

22   (Compl., ¶ 11; Ex. "A.")

23   "Let's bring slavery back!!!!"

24   (Compl., ¶ 12; Ex. "A.")  Hereinafter, the above three emails will be referred to as "the

25   imposter's emails."

26   On April 26, 2021, Defendants posted the imposter's emails on the BLM Sacramento

27   Facebook page (https://www.facebook.com/BlackLivesMatterSac). Defendants wrote the

28   following and posted it next to the imposter's emails on the BLM Sacramento Facebook page:

1   So this woman Karra Crowley has been emailing us and we figured she needs to
    be famous.  She actually owns a business called Crowley Properties in Roseville
2   but she lives in Loomis.

3   (Compl. ¶ 13; Ex. "A.")

4       Immediately upon learning of Defendants' Facebook posts, Ms. Crowley emailed

5   Defendant Faison stating that the imposter's emails Defendants posted on the BLM Sacramento

6   Facebook page were not from Ms. Crowley, and Ms. Crowley requested Defendants to remove

7   Defendants' posts.  (Compl., ¶ 21; K. Crowley Decl., ¶ 11.)  Defendants did not respond to

8   Ms. Crowley's email, but they then posted the follow:

9       HER [Karra Crowley] INFORMATION HAS BEEN VERIFIED.  I AM NOT
        GOING TO BE RESPONSIBLE FOR SHARING ADDRESSES
10      AND PHONE NUMBERS BUT FOLKS . . . ESPECIALLY YOU
        LIGHTER HUED FOLKS COMING AND BEING
11      DISRESPECTFUL . . . YOU NEED TO GET YOUR DUCKS IN A
        ROW BEFORE YOU COME HERE MAKING ACCUSATIONS
12
        WE KNOW HER BUSINESS ADDRESS
13      WE KNOW HER PO BOX
        WE KNOW HER AND HER HUSBANDS HOME ADD
14      SHE HAS BEEN VERIFIED

15      ROSEVILLE AND LOOMIS

16
    (Compl., ¶ 14; Ex. "A;" K. Crowley Decl., ¶12.)  Defendants' above Facebook posts will be
17
    referred to herein as "Defendants' Facebook posts."
18
        What followed was a barrage of hateful Facebook posts (both at BLM Sacramento's
19
    Facebook page and Crowley Properties' Facebook page), text messages and phone messages
20
    from friends of Defendants who read Defendants' Facebook posts.  (K. Crowley Decl., ¶ 15-17,
21
    19 and 20.)  For example, on Crowley Properties' Facebook page, Defendants' friends posted
22
    comments such as "Don't rent from here! The owner Karra Crowley is sick and racist!";
23
    "Disgusting human. Do not support this business"; "you're [stet] business is gonna rot in hell and
24
    so are you" (Ex. "B.")
25
        In fact, Defendants' defamation incited death threats, including this text to Mr. Crowley:
26
        "Hey Chris.  Your [sic] bullying, racist days are over.  Your attorneys [sic] office
27      is getting shot up tomorrow.  He's a dead man and so are you and your cunt wife
        and daughter.  You fucking bullying my friends.  Your [sic] a dead mother fucker.
28      . . ."
    (Ex. "C"; Christopher Crowley Decl., ¶ 2.)

1    Ms. Crowley responded by posting a comment explaining that she did not send the
2    emails; that the emails show an email address that is not hers; and that she does not hold any of
3    the views set forth in the emails purported to be from her. (Compl., ¶ 20; Ex. "A"; K. Crowley
4    Decl., ¶ 18.)

5    Defendants refused to remove their Facebook posts, and Defendants' Facebook page still
6    contains the posts. (Compl., ¶ 21; K. Crowley Decl., ¶ 22.)

7    **III.    ARGUMENT**

8    **A.    The Legal Standard For California Anti-Slapp Motions in Federal Court**

9    Under California law, "[t]he analysis an anti-SLAPP motion proceeds in two steps."
10   *Barry v. State Bar of California*, 2 Cal.5th 318, 321 (2017). First, the court determines whether
11   the plaintiff's claims are directed at "an act in furtherance of protected expression." *Metabolife*
12   *Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (citing Civ. Proc. Code § 425.16(b). The moving
13   defendant bears the burden of "identifying all allegations of protected activity, and the claims for
14   relief supported by them." *Baral v. Schnitt*, 1 Cal.5th 376, 396 (2016). At the second step, the
15   burden shifts to the plaintiff to show a "reasonable probability of prevailing in its claims."
16   *Metabolife*, 264 F.3d at 840. The plaintiff must demonstrate that "each challenged claim based
17   on protected activity is legally sufficient and factually substantiated." *Baral*, 1 Cal.5th at 396.

18   In California state courts, the filing of an anti-SLAPP motion stays discovery. Federal
19   rules are different. *Planned Parenthood Fed'n of Am., Inc v Ctr. For Med. Progress*, 890 F.3d
20   828, set forth the standard that district courts must now apply in evaluating anti-SLAPP motions:

21       If a defendant makes an anti-SLAPP motion to strike founded on purely legal
         arguments, then the analysis is made under [Rule] 8 and 12 standards; if it is a
22       factual challenge, then the motion must be treated as though it were a motion for
         summary judgment and discovery must be permitted.
23

24   *Id.* at 833 (quoting *Z.F. v. Ripon Unified School District*, 482 Fed. App'x 239, 240 (9th Cir.
25   2012)). For purely legal challenges, there is no need for the party opposing the motion to
26   "submit evidence showing the merit of their claims." *Id.* at 834. For factual challenges,
27   "discovery must be allowed, with opportunities to supplement evidence based on the factual
28   challenges, before any decision is made by the court." *Id.*

1        Finally, unlike in California state court, which requires the claims to be stricken without

2  leave to amend, federal procedure mandates that a plaintiff who loses an anti-SLAPP motion

3  must have the opportunity to amend the complaint. *Verizon Delaware, Inc. v. Covad Commc'ns*

4  *Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) ("[G]ranting a defendant's anti-SLAPP motion to strike

5  a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide

6  with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.").  At the second stage, after the

7  plaintiff filed an amended complaint and the parties conducted discovery, the court would

8  address the defendant's factual challenges. *Todd v. Lovecruft*, 2020 WL 60199, at \*8 (N.D. Cal.

9  Jan. 6, 2020).

10        Here, the evidence demonstrates that Defendants' defamatory statements are not

11  protected speech, and plaintiffs have a reasonable probability of prevailing on their claims.

12      **B.**    **Defendants' Publications Are Not Protected Activity**

13        Defendants contend that their defamatory activity is protected as statements or other

14  actions involving a public issue or an issue of public interest under Code of Civil Procedure

15  section 425.16, subdivisions (e)(3) and (4): "(3) any written or oral statement or writing made in

16  a place open to the public or a public forum in connection with an issue of public interest, or (4)

17  any other conduct in furtherance of the exercise of the constitutional right of petition or the

18  constitutional right of free speech in connection with a public issue or an issue of public

19  interest." *Id.* at § 425.16, subd. (e)(3), (4).

20        In particular, Defendants argue that Defendants' publications involve a public

21  conversation about systemic racism.  The evidence disproves Defendants' assertion.

22        The California Supreme Court in *FilmOn.com v. DoubleVerify, Inc.* (2019) 7 Cal.5th 133,

23  recently addressed what constitutes matters of public interest protected by Section 425.16.  In

24  that case, the plaintiff (a media entertainment entity) alleged the defendant (a business providing

25  authentication services to customers considering advertising on the plaintiff's website) falsely

26  characterized the plaintiff's website as containing copyright infringement and adult content, and

27  sued for trade libel and slander. *FilmOn.com*, 7 Cal.5th at 141-142.  The defendant moved to

28  strike the claims, arguing adult content and copyright infringement are public interest issues

1  | under section 425, subdivision (e)(4). *FilmOn.com*, 7 Cal.5th at 142.

2  |     The California high court agreed these are matters of public interest, but concluded that,

3  | to show anti-SLAPP's applicability under section 425.16, subdivision (e)(4), " **'it is not enough**

4  | **that the statement refer to a subject of widespread public interest; the statement must in**

5  | **some manner *itself contribute to the public debate*.' "** *FilmOn.com, supra*, 7 Cal.5th at 150,

6  | 154; emphasis added. **The court said, "'[c]ontribut[ing] to the public debate'" means the**

7  | **defendant "participated in, or furthered, the [public] discourse that ma[de] [the] issue one**

8  | **of public interest."** *Id.* at 150-151; bold added..

9  |     To assist courts in applying this analysis, the *FilmOn.com* court established a two-part

10 | inquiry to determine whether a defendant has met its burden to show its alleged wrongful

11 | activities fell within section 425.16, subdivision (e)(4)'s public interest requirement: "First, we

12 | ask what 'public issue or [ ] issue of public interest' the speech in question implicates—a

13 | question we answer by looking to the content of the speech. [Citation.] Second, we ask what

14 | functional relationship exists between the speech and the public conversation about some matter

15 | of public interest." *FilmOn.com*, 7 Cal.5th at 149-150.

16 |     On the second inquiry, the court stated that a statement falls within subdivision (e)(4) if it

17 | "contributes to—that is, 'participat[es]' in or furthers—*some public conversation on the issue.*"

18 | *FilmOn.com*, 7 Cal.5th at 151. And, the court made clear that this analysis must include a

19 | consideration of the *context* or specific circumstances in which the statement was made,

20 | "including the identity of the speaker, the audience, and the purpose of the speech." *Id.* at 140.

21 |     Three months later, California's high court decided *Wilson v. Cable News Network, Inc.*

22 | (2019) 7 Cal.5th 871, in which the court addressed primarily the issue whether employment

23 | claims alleging discrimination and retaliation can reflect protected activity under section 425.16.

24 | *Wilson*, 7 Cal.5th at 881, 885-898. But the court also considered the issue whether the anti-

25 | SLAPP statute applied to the employee's defamation claims, which alleged that the employer

26 | (CNN) falsely told the employee's supervisor and the employee's prospective future employers

27 | that the employee had committed plagiarism. *Id.* at 899. The court concluded the anti-SLAPP

28 | statute did not apply to these statements because they were about one particular instance of

1   plagiarism and not the bigger issue of honesty in the media.

2       Similarly, here, **CNN's alleged statements about an isolated plagiarism
        incident did not contribute to public debate about when authors may or may
3       not borrow without attribution.** "What a court scrutinizing the nature of speech
        in the anti-SLAPP context must focus on is the speech at hand, rather than the
4       prospects that such speech may conceivably have indirect consequences for an
        issue of public concern." (*Rand Resources, LLC v. City of Carson, supra,* 6
5       Cal.5th at p. 625, 243 Cal.Rptr.3d 1, 433 P.3d 899; see *Consumer Justice Center
        v. Trimedica International, Inc., supra,* 107 Cal.App.4th at p. 601, 132
6       Cal.Rptr.2d 191 ["If we were to accept [defendant's] argument that we should
        examine the nature of the speech in terms of generalities instead of specifics, then
7       nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP
        statute"].) **To sweep in a claim about falsehoods made regarding a nonpublic
8       figure, where the falsehoods do not contribute in any meaningful way to
        discussion or resolution of an ongoing matter of public significance, would do
9       nothing to advance the statute's stated purpose of shielding defendants from
        meritless lawsuits designed to chill speech and petitioning on matters of
10      public interest or controversy.** (See § 425.16, subd. (a).)

11  *Wilson,* 7 Cal.5th at 903; bold added.

12      *Accord, Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 85 ("Here, the specific nature

13  of the speech was about falsified data and plagiarism in two scientific papers, not about global

14  warming."); *Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098,

15  1105-1106 [court held while discussion of drug and alcohol rehabilitation services may well be

16  an issue of public interest, licensing status of a single rehabilitation facility was not]; *Mann v.*

17  *Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, disapproved on another ground

18  in *Baral v. Schnitt, supra,* 1 Cal.5th at p. 392, [in holding the anti-SLAPP statute did not apply,

19  court reasoned challenged statements "were not about pollution or potential public health and

20  safety issues in general, but about [the plaintiff's] specific business practices"]; *Commonwealth*

21  *Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 [speech at issue

22  concerned a company's investment investigation services and was not about investment scams in

23  general].

24      In the present case, the imposter's emails contain racist slurs to a small Sacramento

25  corporation, BLM Sacramento and its founder, Ms. Faison. Yes, the imposter's emails are vile.

26  However, the emails do not address the issue of the day, *systemic racism.*[2]  Rather, the

27

28      [2]   *See e.g., https://health.cornell.edu/initiatives/skorton-center/racism-public
        -health-crisis* ("Recent events have once again brought into sharp relief the depth of **systemic**

1  imposter's emails constitute one ignorant person's racist rants. There is a big difference between

2  these two things.

3       Individual or interpersonal racism is pretty easy to explain. It's name-calling. It's
        the white kid on the bus who doesn't want to sit next to the Black kid. It happens
4       with adults, too. Systemic racism, though, is bigger, and it's more complicated,
        and there's more skepticism about whether it really exists. . . .
5

6  (https://www.npr.org/2020/07/01/885878564/what-systemic-racism-means-and-the-way-it-harms

7  -communities.)

8       Systemic racism is entirely different.

9       "**Systemic Racism** (also called structural or institutional racism) - racism that
        exists across a society within, and between institutions/organizations across
10      society.
              • Refers to the complex interactions of large scale societal systems,
11      practices, ideologies, and programs that produce and perpetuate inequities for
        racial minorities. The key aspect of structural or systematic racism is that these
12      macro-level mechanisms operate independent of the intentions and actions of
        individuals, so that even if individual racism is not present, the adverse conditions
13      and inequalities for racial minorities will continue to exist (Gee & Ford, 2011).
              • Examples: housing discrimination, government surveillance, social
14      segregation, racial profiling, predatory banking, access to healthcare,
        hiring/promotion practices, mandatory minimum sentences."
15

16  (https://fitchburgstate.libguides.com/c.php?g=1046516&p=7602969 )

17      Exposing one imposter's racist rants to the public – and then wrongfully attributing those

18  emails to Karra Crowley – does not contribute in a meaningful way to the issue of whether

19  systemic racism exists in America and, if so, what to do about it.

20      In fact, the responses to Defendants' Facebook posts prove this point. Many people wrote

21  comments in response to Defendants' Facebook posts. (*See* Exhs. "B," "C," and "D.") **Not a**

22  **single comment discussed systemic racism.** (*Id.*; Crowley Decl., 15-17, 19 and 20.) Instead,

23  all of the comments expressed scorn for Mr. and Mrs. Crowley. (*Id.*) For example, some of the

24  comments posted on the Crowley Properties' Facebook page include:

25      •      "Don't rent from here! The owner karra [sic] Crowley is sick and racist!"

26

27  ────────────

28  **racism** in the U.S., . . ." [bold added]); https://www.brookings.edu/blog/how-we-rise/
    2020/06/11/ systemic-racism-and-america-today/ ("Unaddressed **systemic racism** is, in my mind,
    the most important issue in the United States today. . . ." [bold added])

1          •        "Damn terrorists"

2          •        Disgusting human.  Do not support this business."

3     (Ex. "B," at p. 3.)

4          On the Crowley Properties website, the following messages were sent using the "Contact

5     Us" feature:

6          •        "Fuck Karra Crowley.  She is a racist cunt and deserves nothing.  Karra is a
                   horrible person.  Fuck you bitch."
7
           •        "Racist hag."
8
           •        "What people think you're a cunt too!"
9

10    (Ex. "G.")

11         Even worse, the Crowleys received death threats.  For example, Mr. Crowley received the

12    following text messages:

13         "Hey Chris.  Your [sic] bullying, racist days are over.  Your attorneys [sic] office
           is getting shot up tomorrow.  He's a dead man and so are you and your cunt wife
14         and daughter.  You fucking bullying my friends.  Your [sic] a dead mother fucker.
           . . ."
15    (Ex. "C"; Christopher Crowley Decl., ¶ 2.)

16         On their home telephone, the Crowleys received the following death threat: "Karra

17    Crowley, you are a racist.  I am going to kill you."  (Ex. "D";  K. Crowley Decl., ¶ 15.)

18         One person posted a sign across the street from Ms. Crowley's house held in the ground

19    with two shovels – an apparent implicit threat to bury Ms. Crowley – stating, "KARRA - FUCK

20    YOU, YOU RACIST CUNT!"  (Ex. "F";  K. Crowley Decl., ¶ 20.)

21         As the evidence demonstrates, Defendants' defamatory posts did not "contribute to the

22    public debate" about systemic racism, as required for protection under Section 425.16.  To the

23    contrary, Defendants' defamatory statements were clearly intended to and did incite hatred and

24    anger against Plaintiffs.  Section 425.16 does not protect that kind of speech.

25                 **1.     Plaintiffs are not public figures**

26         Defendants argue that, because one of the imposter's email says, "My husband and I are

27    pillars in this community," that makes Plaintiffs celebrities or public figures and, therefore,

28    creates a public interest.  However, the imposter's email cannot turn private citizens into public

1   figures by words in an email.  The Crowleys are not and never have been public figures.  (K.
2   Crowley Decl., ¶ 23.)

3       Moreover, "'those charged with defamation cannot, by their own conduct, create their
4   own defense by making the claimant a public figure. [Citation]  A person cannot turn otherwise
5   private information into a matter of public interest simply by communicating it to a large number
6   of people. [Citation]" *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1133 (2003).

7       For example, in *Bernstein v. LaBeouf*, 43 Cal.App.5th 15 (2019), Plaintiff (a bartender)
8   sued a famous actor (Shia LaBeouf), alleging assault, slander, and intentional infliction of
9   emotional distress, arising from confrontation that occurred in which actor called bartender a
10  "racist" after bartender refused to serve alcohol to actor and his companion on belief that the two
11  were already inebriated, after which other people began referring to him as the "racist bartender."
12  Defendant argued his speech was protected in connection with an issue of public interest.

13      LaBeouf contended his celebrity status made "his day to day conduct 'a public issue or an
14  issue of public interest.'"  According to LaBeouf, since footage of him calling Bernstein a racist
15  and physically threatening Bernstein was disseminated on the internet and on television, his
16  conduct must involve a matter of public interest under section 425.16, subdivision (e)(3) and (4).
17  *Bernstein*, 43 Cal.App.5th at 23.  The trial court and court of appeal disagreed.

18      In rejecting Defendant's contentions, the court of appeal noted, **"[w]hile racism is**
19  **undoubtedly an issue of public interest, a defendant cannot convert speech that would**
20  **otherwise not be entitled to anti-SLAPP protection into protected activity by "defining the**
21  **[ ] narrow dispute by its slight reference to the broader public issue."** *Id.* at 24 (citing
22  *FilmOn*, 7 Cal.5th at 152); bold added.  The court added, "[a]lthough footage of the altercation
23  was later disseminated to many people on the internet and television, a private dispute does not
24  become a matter of public interest simply because it was widely communicated to the public."
25  *Id.*

26      Plaintiffs Mr. and Mrs. Crowley are not celebrities or public figures of any sort.  (K.
27  Crowley Decl., ¶ 23.)  The only attention they have ever received from the public is the wave of
28  hatred occasioned by Defendants' falsely attributing to Plaintiffs the imposter's racist emails.

1   (*Id.*) Even the subsequent interview by Fox40 was the defamatory content of Defendants'

2   publications, including Defendants' successful attempts to incite scorn for Plaintiffs. (*Id.*)

3   **C.   Plaintiffs Are Likely To Prevail on the Merits**

4   If the moving party on an anti-SLAPP motion makes the required showing on any one

5   claim, the burden shifts to the opposing party to demonstrate the merit of that claim. *Baral v.*

6   *Schnitt* (2016) 1 Cal.5th 376, 396. To satisfy the probability of prevailing standard, "[t]he

7   plaintiff need only state and substantiate a legally sufficient claim. [Citation.] **The plaintiff's**

8   **evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats**

9   **the plaintiff's showing as a matter of law.**" *City of Montebello v. Vasquez* (2016) 1 Cal.5th

10   409, 420; bold added. Although the opposing party need only show "minimal merit" to satisfy

11   the burden (*Montebello,* 1 Cal.5th at p. 420), the plaintiff cannot rely on the allegations of the

12   complaint, but must produce evidence that would be admissible at trial. *HMS Capital, Inc. v.*

13   *Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212. Moreover, "[b]ecause plaintiffs' evidence

14   must be credited, a court is not to make credibility determinations or otherwise weigh the

15   evidence submitted." *Abir Vohen Treyzon Salo, LLP v. Lahiji*, 40 Cal.App.5th 882, 889.

16   Here, Plaintiffs allege libel. The elements of a libel claim are (1) publication of fact that

17   is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes

18   special damage. *Taus v. Loftus* (2007) 40 Cal.4th 683, 720.

19   Preliminarily, it is well established that defamation of an individual is not protected by

20   the constitutional right of free speech. *Beauharnais v. Illinois* (1952) 343 U.S. 250, 254–256, 72

21   S.Ct. 725, 729-731.

22   As a matter of law, statements that a person made racist comments are libel per se.

23   *Samaan v. Sauer*, 2008 WL 4279385, at *3 (E.D. Cal. 2008). Likewise, "[f]alsely ascribing

24   statements to a person which would have the same damaging effect as a defamatory statement

25   about him is libel." *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1132; *see*

26   *also Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447

27   (1991) ("False attribution of statements to a person may constitute libel, if the falsity exposes that

28   person to an injury comprehended by the statute."); *Condit v. Nat'l Enquirer, Inc.*, 248 F. Supp.

1   2d 945, 967 (E.D. Cal. 2002)(quoting the above cases).

2       Defendants have not argued that Defendants' Facebook posts are anything other than

3   defamatory. Clearly, the only evidence before the court proves that Ms. Crowley did not write or

4   send the imposter's emails. (K. Crowley Decl., ¶ 9,) Defendants' attribution of the imposter's

5   racist emails to Ms. Crowley are false and defamatory. (*Id.*) As discussed *infra*, the publication

6   of this defamatory content was not privileged. And Plaintiffs have suffered special and actual

7   damages. (*See K.* Crowley Decl., ¶¶ 15-17 [demonstrates Ms. Crowley's special damages];

8   Ex. "B" [the posts on the Crowley Properties Facebook page show the harm to that business's

9   reputation].)

10      Thus, the evidence shows that Plaintiffs are likely to prevail on their libel claim.

11          **1.    The Evidence Proves Defendants' Actual Malice**

12      Defendants argue that Plaintiffs must prove actual malice to sustain a claim for libel.

13  Even assuming, *arguendo*, that Defendants are correct, the evidence proves actual malice.

14          **(a)    Defendants argue the wrong standard for "actual malice"**

15      Defendants argue that, to establish actual malice, the plaintiff must prove that "a false and

16  defamatory statement is published with knowledge of falsity or a reckless disregard for the truth

17  . . .." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696,

18  105 L. Ed. 2d 562 (1989). This is true, however, **only if the plaintiff is a public figure**. As the

19  Court explained, "For example, in *Harte-Hanks Commc'ns, Inc.,* the plaintiff was a candidate for

20  public office. "A public figure may not recover damages for a defamatory falsehood without

21  clear and convincing proof that the false "statement was made with 'actual malice'—that is, with

22  knowledge that it was false or with reckless disregard of whether it was false or not." *Id*. at 659,

23  109 S. Ct. at 2681.

24      However, when the plaintiff is not a public figure, "[t]he malice necessary to defeat a

25  qualified privilege is actual malice which is established by a showing that the publication was

26  motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked

27  reasonable ground for belief in the truth of the publication and thereafter acted in reckless

28  disregard of the plaintiff's rights." *Taus v. Loftus* (2007) 40 Cal.4th 683, 721-722.

1  Here, the evidence establishes that the Crowleys are likely to prove actual malice under
2  either standard.

3  First, Plaintiff is not required to allege or prove actual malice because Defendants have
4  not shown that (a) Plaintiffs are public figures, or (b) Defendants' defamatory conduct addressed
5  matters of public interest. (*See supra.*)

6  Second, Plaintiffs' complaint does, in fact, allege facts demonstrating Defendants'
7  malice, and the evidence supporting this brief proves Defendants' actual malice. Specifically,
8  Defendants posted on Facebook the imposter's racist emails and falsely attributed the emails to
9  Ms. Crowley. (Compl., ¶¶ 10-12; K. Crowley Decl., ¶¶ 3-9.) Then, Defendants posted that they
10 had "verified" that Karra Crowley sent the emails – which was patently false. (Compl., ¶ 14; K.
11 Crowley Decl., ¶ 9.)

12 The evidence is undisputed that Defendants did not verify that Ms. Crowley sent the
13 emails: (1) Ms. Crowley's declaration stating she did not write or send the imposter's emails (*Id*);
14 and (2) Defendants did not introduce any evidence to show they verified that Ms. Crowley wrote
15 or sent the imposter's emails.

16 The ostensible reason for Defendants to falsely post that they had verified Ms. Crowley's
17 identity was to persuade readers – who would reasonably doubt that anyone would send such vile
18 emails *and* attach their name to the emails – that the emails were actually sent by Ms. Crowley.
19 Thus, the evidence establishes *both* that Defendants published their defamatory content with
20 knowledge of its falsity or reckless disregard for whether it was false or not.

21 Furthermore, Defendants incited their friends to make Plaintiffs "famous." (Compl.,
22 ¶ 13; Ex. "A.") Defendants posted the cities in which Plaintiffs live and work, apparently to help
23 their friends make Plaintiffs famous. (Compl., ¶¶ 13 and 14; Ex. "A.") Why would Defendants
24 command their friends to make Plaintiffs famous? The patently obvious reason is to harm
25 Ms. Crowley, her husband and their business. In other words, Defendants intentionally incited
26 their friends to do harmful things to Plaintiffs by Defendants' defamatory posts – which shows
27
28

1  Defendants' ill will and/or hatred towards Plaintiffs.[3]

2       As Defendants intended, Plaintiffs did, in fact, suffer the consequences of Defendants'
3  incitement.  Ms. Crowley received death threats, scornful posts on the BLM Sacramento
4  Facebook page and Crowley Properties' Facebook page, and vile and hateful text and phone
5  messages.  (K. Crowley Decl., ¶¶ 15-17, 19 and 20.)

6       If the court determines that actual malice is an element of Plaintiffs' claim and that the
7  complaint does not adequately allege actual malice, Plaintiffs request leave to amend.

8                    **2.    Section 230 Does Not Immunize Defendants**

9       As Defendants argue, 47 U.S.C. section 230 does, if its conditions are satisfied, provide
10  immunity from liability for the interactive computer service provider and user for publishing a
11  third person's content.  However, Section 230 does not apply to Defendants' defamation.
12  Here's why.

13      First, the original poster (i.e., the author) is always liable for his own content.  "While
14  original posters of defamatory speech do not escape accountability, Congress "made a policy
15  choice ... not to deter harmful online speech [by] imposing tort liability on companies that serve
16  as intermediaries for other parties' potentially injurious messages." *Barrett v. Rosenthal*, 40 Cal.
17  4th 33, 44 (2006).  Thus, BLM Sacramento and Ms. Faison are liable for their original content.

18      Here, Defendants wrote and posted the content that states that Defendants had "verified"
19  that Ms. Crowley sent the imposter's emails (Ex. "A") and urging Defendants' friends to make
20  Ms. Crowley "famous."  (Ex. "A.")  Section 230 would not, therefore, provide any immunity for
21  those publications.  "Plaintiffs are free under section 230 to pursue the originator of a defamatory
22  Internet publication." *Barrett*, 40 Cal.4th at 63.

23      Second, Section 230 provides immunity for Defendants' posting of the imposter's emails
24  only if the imposter "provided" the emails for Defendants to use on the internet; **i.e., if the**
25  **imposter intended for Defendants to post the emails on the internet**. *Batzel v. Smith*, 333

26

27

28      [3]    Significantly, "a plaintiff is entitled to prove the defendant's state of mind through
    circumstantial evidence." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 668, 109 S. Ct. at 2686,
    *citing Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979).

1  F.3d 1018, 1032-33 (9th Cir. 2003).

2  In *Batzel,* Smith sent an e-mail to the operator of a website devoted to museum security

3  and stolen art, accusing Batzel of possessing paintings that may have been stolen by the Nazis

4  during World War II. The operator posted the message on the website, with some changes, and

5  distributed it to the subscribers of his email newsletter. Batzel sued Smith and the operator for

6  defamation. One of the questions in that case was whether Smith "provided" the email to the

7  web operator, as that word is used in Section 230.

8  The Ninth Circuit gave a detailed explanation of the meaning of "provided" as used in

9  Section 230:

10  The question thus becomes whether Smith can be said to have "provided" his e-
   mail in the sense intended by § 230(c). If the defamatory information is not
11  "*provided* by another information content provider," then § 230(c) does not confer
   immunity on the publisher of the information.

12  * * *

13
   . . . **The structure and purpose of § 230(c)(1) indicate that the immunity**
14  **applies only with regard to third-party information provided** *for use on the*
   *Internet* **or another interactive computer service. . . . If information is**
15  **provided to those individuals in a capacity unrelated to their function as a**
   **provider or user of interactive computer services, then there is no reason to**
16  **protect them with the special statutory immunity**.

17  **So, if, for example, an individual who happens to operate a website receives a**
   **defamatory "snail mail" letter from an old friend, the website operator**
18  **cannot be said to have been "provided" the information in his capacity as a**
   **website service**. Section 230(c)(1) supplies immunity for only individuals or
19  entities acting as "provider[s]" or "user[s]" of an "interactive computer service,"
   and therefore does not apply when it is not "provided" to such persons in their
20  roles as providers or users.

21  **Under Cremers's broad interpretation of § 230(c), users and providers of**
   **interactive computer services could with impunity intentionally post material**
22  **they knew was never meant to be put on the Internet. . . . The result would**
   **be nearly limitless immunity for speech never meant to be broadcast over the**
23  **Internet**.

24  Supplying a "provider or user of an interactive computer service" with immunity
   in such circumstances is not consistent with Congress's expressly stated purposes
25  in adopting § 230. Free speech and the development of the Internet are not
   "promote[d]" by affording immunity when providers and users of "interactive
26  computer service[s]" knew or had reason to know that the information provided
   was not intended for publication on the Internet. . . .

27

28  *Batzel,* 333 F.3d at 1032–34; bold added.

1    The *Batzel* court concluded its discussion of Section 230 by holding that "a service

2  provider or user is immune from liability under § 230(c)(1) when a third person or entity that

3  created or developed the information in question furnished it to the provider or user under

4  circumstances in which a reasonable person in the position of the service provider or user would

5  conclude that the information was provided for publication on the Internet or other 'interactive

6  computer service.'" *Batzel*, 333 F.3d at 1034.

7    In the present case, the evidence demonstrates that Ms. Faison and BLM Sacramento

8  could not reasonably have concluded that the imposter intended for Defendants to post the

9  imposter's emails on the internet. For example, if the imposter intended for his/her emails to be

10  posted on BLM Sacramento's Facebook page, the imposter could have posted the email content

11  *directly* to the Facebook page. (K. Crowley Decl., ¶ 18.)

12    Also, Defendants plainly determined that the imposter's emails were suspect and likely

13  did not come from Karra Crowley; that's why Defendants appear to have sought to assure their

14  friends that Ms. Crowley actually sent the emails by posting that Defendants had "verified"

15  Ms. Crowley's identity. (*See* Compl., ¶ 14; Ex. "A.")

16    Finally, when Ms. Crowley emailed Ms. Faison, and then followed up by posting on

17  BLM Sacramento Facebook page, that she did not write or send the imposter's emails, a

18  reasonable person would have known that Ms. Crowley never intended the imposter's emails to

19  be published on the internet. (*See* K. Crowley Decl., ¶¶ 11, 18.)

20    Defendants did not submit any evidence to show that the imposter intended his/her emails

21  to be posted on the internet. Rather, all of the evidence before the court establishes that the

22  imposter did not intend his/her emails to be posted on the internet. Accordingly, Defendants do

23  not qualify for immunity under Section 230.

24  **IV.   CONCLUSION**

25    For the foregoing reasons, Plaintiffs respectfully request this Court to deny Defendants'

26  motion to strike and to permit Plaintiffs to file a motion for attorneys' fees and costs pursuant to

27  Code of Civil Procedure section 426.16(c)(1). In the alternative, if the court believes that, based

28  on the current record, Defendants have met their burden on this motion, Plaintiffs ask the court to

1   permit them to conduct discovery into any factual issues the court believes are disputed and

2   relevant to making a ruling on this matter and to amend the complaint to address any deficiencies

3   found by the court.

4

5   Dated:  June 8, 2021                             OCHRACH LAW GROUP

6

7                                                          _____/s/_____

8                                                          Jeffrey H. Ochrach
                                                          Attorney for Karra and Christopher Crowley
9                                                          and Crowley Properties

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28